**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

NEW YORK STATE VEGETABLE
GROWERS ASSOCIATION, INC. and
NORTHEAST DAIRY PRODUCERS
ASSOCIATION, INC.

        Plaintiffs,

v.

ANDREW CUOMO, in his official capacity
as Governor of New York, LETITIA JAMES,
in her official capacity as Attorney General
of New York, and ROBERTA REARDON,
in her official capacity as Commissioner of
the New York Department of Labor,

        Defendants.

Case No. _____

Date: 12/30/19

---

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANTS

### INTRODUCTION

Plaintiffs New York State Vegetable Growers Association, Inc. ("NYSVGA") and

Northeast Dairy Producers Association, Inc. ("NEDPA") respectfully submit this Brief

in Support of their Motion for a Temporary Restraining Order and Preliminary

Injunction.  Plaintiffs respectfully request this Court temporarily restrain Defendants

from applying and enforcing the Farm Labor Fair Practices Act, 2019 N.Y. Sess. Laws

ch. 105, § 2(2) (the "Act"), pending hearing on their Motion for Preliminary Injunction.

At hearing on Plaintiff's Motion for Temporary Injunction, Plaintiffs further will request

an order preliminarily enjoining Defendants from applying and enforcing the Act

**EXHIBIT**
**1**

pending trial on the merits.  In the alternative, Plaintiffs request an order temporarily restraining and preliminarily enjoining application and enforcement of the Act until contradictions in the Act are addressed by further legislation and/or regulation.

The Act's fatal flaw lies in the fact that it defines "farm laborer" to include supervisors, farm owners and family members of farm owners.  2019 N.Y. Sess. Laws ch. 105, § 4.  However, if farms classify those persons as farm laborers, they would be subject not only to the Act's wage, hour and overtime requirements, but also to the Act's provisions conferring upon farm laborers rights with respect to collective bargaining.  If supervisors, owners and family members are classified as farm laborers, they have the right to engage in concerted activity along with other employees.  But supervisors, owners and family members are also agents of the farm business, and so they must not engage in conduct that would discourage concerted activity, assist in forming of a union, or otherwise violate the rights of farm laborers.

Farms thus find themselves on the horns of a dilemma.  They can either classify supervisors, owners and family members as farm laborers -- assuring violation of the Act's collective bargaining provisions; or risk violating the provisions of New York's labor laws, which expose the farms to civil liability and criminal prosecution.  This untenable dilemma renders the Act unconstitutional on due process grounds.

Further, the Act conflicts with Section 14(a) of the National Labor Relations Act ("NLRA").  The New York Act includes supervisors as part of the pool of farm labor workers who may engage in concerted activities, but the NLRA expressly prohibits states from adopting such legislation.  As such, the Act is preempted by federal law.

## STATEMENT OF FACTS

**A. The Act Works Harm And Injustice Which Undermines The Legislature's Stated Purpose In Adopting The Act.**

Historically, "agricultural workers" have been excluded from the NLRA as well as the overtime pay provisions of the federal Fair Labor Standards Act of 1938 (29 U.S.C. 201, et seq.).  While the Act purports to help agricultural workers by eliminating that exclusion, the harsh economic impact on farms, particularly small farms, will undoubtedly harm both farms and farm workers in many respects.  (Exhibit 9)   By adding supervisors, managers, family members, owners, professional and administrative employees to the class of workers entitled to the day of rest, 60 hour limitation and overtime pay, this economic impact is even greater.

Plaintiffs have attempted to work with government officials in an attempt to minimize the Act's adverse impacts, only to see their concerns ignored.  (Exhibits 18, 19)  As a result, the Act's adverse impacts remain and, indeed, have only been heightened, as the Act's implementation date approaches.  *Id.*

**B. The Organizational Plaintiffs Exist To Protect Those Harmed By The Act.**

Plaintiff NYSVGA is one of the oldest agricultural organizations in New York.(Exhibit 19)   Founded in 1911, the association is a not-for-profit corporation that serves commercial fresh market, storage, and processing vegetable growers.  *Id.* NYSVGA's members consist of farm growers of varying sizes.  *Id.*  NYSVGA plays a vital role in educating members and helping them to comply with laws to remain competitive in a commodity based market that trades internationally.  *Id.*

Plaintiff NEDPA was established in 1993 to give northeast dairy producers a united voice in important issues that have emerged on the dairy horizon, as well as helping member farms with specific regulatory and compliance challenges on their own farms.  (Exhibit 18)   NEDPA members manage over 200,000 cows and create a major economic impact in the State.  *Id.*

Plaintiffs each have members who are directly subject to (and regulated by) the Act's requirements and will suffer irreparable injury from the Act's implementation on January 1, 2020.  (Decl. of Jon Greenwood, Exhibit 18; Decl. of Brian Reeves, Exhibit 19).  Plaintiffs' members will be subjected to invasion of a legally protected interest that is concrete and particularized, actual and imminent, that will be redressed by the requested relief without the need for individual members as plaintiffs.  *Id.*

Moreover, Plaintiffs each have suffered an imminent injury as an organization that is distinct, palpable and fairly traceable to enforcement of the Act.   (Decl. of Jon Greenwood, Exhibit 18; Decl. of Brian Reeves, Exhibit 19).  As a result of the Act, both NYSVGA and NEDPA have been forced to devote substantial resources and time to both educate and counsel their members about how to comply with the Act, and pursue clarification and relief from the State regarding the Act's ambiguous and contradictory terms and requirements.  *Id.*  The time, money, and effort expended has been considerable, including multiple webinars, a five day Roadshow throughout the State, development of a White Paper to the governor and legislature detailing the concerns raised herein, newsletters, telephone calls and meetings with members to educate on the law, and numerous meetings with regulatory agencies and legislators in Albany. *Id.*

4

This impact will only be exacerbated once Plaintiffs' members are subjected to the Act's requirements, enforcement actions, union organizing activities, investigations and penalties. *Id.* The time and money Plaintiffs have spent – and will be spending – helping their members understand and comply with the Act prevents them from assisting members with other matters and concerns. *Id.* A favorable decision would redress Plaintiffs' injuries, and provide time for the State of New York to correct the unlawful deficiencies in the Act. *Id.*

Plaintiffs reside in this judicial district and the Act's requirements will be felt in this judicial district. (Decl. of Jon Greenwood, Exhibit 18; Decl. of Brian Reeves, Exhibit 19).

### C. The Defendants Are Responsible For Enactment, Application And Enforcement Of The Act.

Defendant Andrew Cuomo is the current Governor of New York and has, among many responsibilities, the authority to sign into law bills tendered by the New York Legislature and to oversee enforcement and administration of those laws. Governor Cuomo signed the Act into law on July 17, 2019. (Exhibit 3) He maintains his principal place of business in the State Capitol Building in Albany, New York.

Defendant Letitia James is the Attorney General of New York, the State's chief legal officer. As part of her duties, Attorney General James oversees the Labor Bureau, which investigates violations of minimum wage, overtime, prevailing wage, and other basic labor laws throughout the State and brings civil and criminal actions against employers who violate these laws. (N.Y. Lab. Law Article 7, § 214, Exhibit 7) She

maintains her principal place of business in the State Capitol Building in Albany, New York.

Defendant Roberta Reardon is Commissioner of the New York Department of Labor and is head of the State agency responsible for administering and enforcing State labor laws and regulations, including the Act.  (N.Y. Lab. Law Article 2, § 21)   She maintains her principal place of business in the State Campus Building in Albany, New York.

### D.  The Act Fundamentally Changes The Relationship Between Farm And Farm Laborer But, In So Doing, Creates Contradictory Obligations.

On July 17, 2019, the New York State Legislature passed the Act.  *See* 2019 N.Y. Sess. Laws ch. 105.  The Legislature found "that agriculture is one of New York's leading and most important industries, resulting in over $5 billion annually and making New York a global leader in many crops and agricultural products."  *Id.*  § 2(1).  The Legislature also found that 98% of New York's farms are family owned and these farms contributed $2.4 billion to the State's GDP in 2017."  *Id.*  The Legislature also found that the success of New York's robust agricultural industry is due to "collaborative work between farmers and farm laborers."  *Id.* § 2(2).

Among other things, the Act (i) mandates that farm laborers be given one day of rest in every calendar week, *id.* § 4; (ii); prohibits farms from requiring any employee to work more than 60 hours in any calendar week, *id.* § 6; and (iii) provides that farms may permit farm laborers to work more than 60 hours, but must pay overtime at the hourly rate of 1.5 times the regular rate of pay for all hours in excess of 60 hours or for work on

the employee's day of rest, *id*.  Most significantly, for the purposes of this Motion, the

Act prohibits farms from interfering with farm laborers' right to collectively bargain.  *Id*.

§§ 3, 19-21.   The Act purports to grant farm laborers the right to engage in concerted

activity, to form unions and to collectively bargain wages, hours and terms and

condition of employment starting on January 1, 2020.

Under the Act, authority to regulate the one day of rest, 60 hour maximum work

week and overtime provisions of the law is placed with the New York State Department

of Labor ("NYSDOL").  The Act's requirements in regard to the right of farm laborers to

engage in concerted activities, to form unions and engage in collective bargaining are

delegated to the New York Public Employment Relations Board ("PERB").

The Act's definition of "farm laborer" includes supervisors, farm owners and

family members of farm owners.  "Farm labor" is defined, for purposes of the NYSDOL

wage and hour regulatory authority, as follows:  "The term 'farm labor' shall include all

services performed in agricultural employment in connection with cultivating the soil,

or in connection with raising or harvesting of agricultural commodities, including the

raising, shearing, caring for and management of livestock, poultry or dairy."  *See* 2019

N.Y. Sess. Laws. ch. 105, § 4 (amending N.Y. Lab. Law Article 5, § 161(1)).

While "farm labor" is defined for purposes of the NYSDOL wage and hour

regulatory authority, the term farm ***laborer*** is not.  Presumably a "farm laborer" is one

who performs farm labor.  Because the definition of "farm labor" includes work "in

connection with" the work described above, it appears that anyone that works on a

farm is performing work in connection with farm work and is, therefore, a "farm laborer" covered under the hour limitations and overtime provisions of the law.

Under the Act, "farm laborer" *is* defined for purposes of the PERB regulatory authority. "Farm laborers" are expressly and broadly defined to include any individual engaged or permitted by an employer to work on a farm, except the parent, spouse, child, or other member of the employer's immediate family. 2019 N.Y. Sess. Laws ch. 105, § 3 (amending N.Y. Lab. Law Article 20, § 701(3)).

On the face of the Act, farms are obligated to instruct their supervisory employees, owners and owner family members not to engage in certain activities that would be unduly influential (one way or the other) to those workers' rights to engage in concerted activity. *See* 2019 N.Y. Sess. Laws ch. 105, § 19 (amending N.Y. Lab. Law Article 20 § 704b) (Exhibits 3 and 8). But because supervisors and family members are themselves farm laborers, with the right to collectively bargain, instructing them in such a manner would interfere with *their* right to engage in concerted activity. By definition, a farm would violate the Act simply by virtue of complying with it.

**E. The Industry Expressed Concerns With Application And Enforcement Of The Act.**

Under the Act, the New York State Department of Labor ("NYSDOL") is vested with authority to regulate the wage and hour provisions of the Act, while the Public Employment Relations Board ("PERB") is vested with authority to regulate the Act's concerted activity, union selection, contract formation, and arbitration provisions. The

Attorney General is vested with authority to pursue criminal prosecution for violations of the New York Labor Law.  (Exhibit 7)

Following passage of the Act, Plaintiffs engaged with the Legislature and the Governor in the process of implementing the Act in an attempt to assure the legislation did not harm farms.   (Exhibits 10, 18 and 19)  Since passage of the legislation, Plaintiffs have also tried to secure further clarification of the Act's terms through the NYSDOL administrative rulemaking process and educational programs designed to educate farms and regulatory authorities regarding the impact of the Act.  (Exhibits 18 and 19)

During the week of November 18, 2019, Plaintiffs organized and conducted a "Labor Roadshow" in five (5) cities throughout the state.  *Id.*  The Roadshow consisted of five (5) full day programs to explain the Act to farmers.  *Id.*  Representatives from the NYSDOL and PERB agreed to attend the Roadshow.  *Id.*

NYSDOL had committed to issue a frequently asked questions and answers list ("FAQ") prior to the Roadshow.  *Id.*  The expressed intention was that agents from the NYSDOL would be present at the Roadshow to educate farmers and Plaintiffs' members on the interpretations and compliance requirements under the Act.  NYSDOL was unable to complete that FAQ prior to the Roadshow.  *Id.*  However, the agencies did present their preliminary understandings on interpretations and compliance requirements during the Roadshow.  *Id.*

The presentations by NYSDOL and PERB demonstrated that the implementation of the Act would be problematic for farms.  Principal among the concerns of the industry was the lack of an exclusion from coverage under the Act for farm owners and

their extended family, as well as supervisors or executives, administrative and

professional employees.  These concerns were acknowledged on each day of the

Roadshow, but the NYSDOL and PERB presenters could only comment that it was

hoped this would be resolved prior to implementation of the Act.  *Id.*

Following the Roadshow, on December 13, 2019, Plaintiffs submitted a "White

Paper" to Governor Cuomo and the New York Legislature.  *Id.*   The purpose of the

White Paper was to outline the missing exclusions and definitions in the Act and the

inherent contradictions arising from those omissions, the harm that would arise from

implementing the law without resolution of those issues, and to identify specific

language changes that might resolve those issues, allowing Plaintiffs to reduce the

imminent harm by properly educating farmers to implement the Act.  *Id*.

The White Paper specifically addressed the failure of the Act to exclude

supervisors, owners and family members of owners, stating:

> [T]he following issues have been determined to be
> fundamental impediments to effectively implementing the
> new law. These two topics are: (1) coverage of foreman,
> supervisors, executives, administrators and professionals; (2)
> the definition of an owner for purposes of exclusion of
> family members under the Act.  These two topics are of vital
> importance under all parts of the Act.
>
> . . .
>
> this is so vital to the operation of farms and successful
> implementation of the law, that it cannot be ignored.  The
> inability to make these policy decisions undermines the
> ability to implement compliance, due to the impact on the
> individuals that will be obligated to implement policy
> changes.
>
> Additionally, many of the forms and documents that are to
> be made available to farm employers and employees are not

available. Without these, farms cannot fully comply.  Even if
they are issued now, farms do not have enough time to
complete them by January 1, 2020.

(Exhibit 10).

## F.  The FAQ Confirms The Impossibility Of Complying With The Act.

The FAQ was not released until December 17, 2019, one month after the Labor

Roadshow.  The FAQ contained these provisions, which only exacerbated the concerns

of the industry regarding coverage:

> 4. Who is covered by the day-of-rest provision of the FLFLPA? *All farm
> laborers are covered except for the foreman* in charge (may be more than
> one), and members of the employer's immediate family including a
> parent, child, or spouse.
>
> 5. Who is covered by the over-60 overtime provision of the FLFLPA? All
> farm laborers, including *crew leader/chief and foremen in charge, are
> covered by the overtime provisions of the Act* except for the members of
> the employer's immediate family including a parent, child or spouse.
>
> 6. Are family members of LLCs, S-corps, C-Corps or partnerships
> excluded from the day of rest and overtime provisions?  Yes, the
> immediate family members, including a parent, child or spouse, are
> excluded from the day of rest and overtime provisions.  *The immediate
> family members of shareholders are not excluded from the day of rest and
> overtime provisions.*

 (Exhibit 11)

The FAQ does exclude a "foreman in charge", but only from the one day of rest

provision, and there is no definition of "foreman in charge."  None of the FAQs identify

an exemption for supervisors, other than the one concerning the one day of rest for

foreman in charge.  Neither the Act or the FAQs identify the standard exemption for

bona fide executive, administrative or professional employees recognized under federal

and state laws concerning overtime pay.

11

**ARGUMENT**

The Court should temporarily restrain enforcement of the Act.  Farms are

incapable of complying with the Act's provisions as long as supervisors, owners and

family members are included within the definition of "farm laborers", who are entitled

to wage, overtime and collective bargaining protections.

Plaintiffs are likely to succeed on the merits of their claim because the due

process clause of the United States Constitution prohibits a State from adopting

legislation with which its citizens cannot comply.  (Section I.A).  Plaintiffs are also likely

to succeed on the merits of their federal preemption claim because the NLRA prohibits

states from forcing employers to classify supervisors as employees.  (Section I.B).

Plaintiffs' member farms will suffer irreparable harm from the fact that they are

incapable of fully complying with the Act.  They also suffer irreparable harm from

classifying supervisors as employees – a classification which cannot be undone once the

Court strikes down the Act's requirement (or once the Legislature recognizes how inane

and contrary to law such a classification is and amends the Act).  Plaintiffs also suffer

harm which cannot be remedied by money damages as a result of being unable to

advise members as to how to comply with their obligations under the Act and being

diverted from their core mission.  (Exhibits 18 and 19)

**I.      Plaintiffs Are Entitled To A Temporary Restraining Order If They Establish A
         Reasonable Likelihood Of Success On The Merits And Irreparable Harm.**

The standard for either a temporary restraining order or preliminary injunction

is well established. The plaintiff must show 1) irreparable harm and 2) either (a) the

likelihood of success on the merits or (b) the existence of sufficiently serious questions on the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the plaintiff. *See Cty. of Nassau v. Leavitt,* 524 F.3d 408, 414 (2d Cir. 2008). "In the Second Circuit, the standard for a temporary restraining order is the same as for a preliminary injunction." *Jackson v. Johnson*, 962 F. Supp. 391, 392 (S.D.N.Y. 1997).

Plaintiffs have established the prerequisites to injunctive relief, entitling them to a temporary restraining order prohibiting application and enforcement of the Act.

## II.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS.

### A.  The Act Is Unenforceable Because It Is Inconsistent And Incapable Of Lawful Performance.

The Fourteenth Amendment to the United States Constitution provides that no state "shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.  Holding an individual criminally liable for failing to comply with a duty imposed by statue, with which it is legally impossible to comply, deprives that person of his due process rights. *Doe v. Snyder*, 101 F. Supp. 3d 722, 723-24 (E.D. Mich. 2015).  Courts must "assume that man is free to steer between lawful and unlawful conduct, [and, therefore,] insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

"It is well settled that the law is not so unreasonable as to require the performance of impossibilities as a condition to the assertion of acknowledged rights . . .

and, when Legislatures use language so broad as to lead to such results, courts may properly say that the Legislature did not intend to include those cases in which a literal obedience has become impossible." *Gigliotti v. N.Y., C. & S. L. R. Co.*, 107 Ohio App. 174, 181, 157 N.E.2d 447, 452 (1958).  "If a statute apparently requires the performance of something which cannot be performed, a court may hold it inoperative." *Id.*

In *RxUSA Wholesale, Inc. v. HHS*, the plaintiffs brought a motion for a preliminary injunction, seeking to enjoin Defendants Department of Health and Human Services and the U.S. Food and Drug Administration ("FDA") from making effective an FDA regulation promulgated to enforce § 503(e)(1)(A) of the Prescription Drug Marketing Act of 1987 ("PDMA").  467 F. Supp. 2d 285, 292-93 (E.D.N.Y. 2006).  The Rule required wholesale distributors who are not authorized distributors to provide a pedigree statement "identifying each prior sale, purchase, or trade of such drug" that shall include "the business name and address of all parties to each prior transaction involving the drug, starting with the manufacturer", while at the same time exempting authorized distributors from the pedigree requirement.  *Id.* at 299.  To the extent that it did so, the plaintiffs maintained, the Rule made it impossible for the unauthorized wholesale distributors to comply with the regulation as written.  *Id.*  That impossibility of compliance, the plaintiffs argued, rendered the regulation unconstitutional.  *Id.*

The district court agreed and granted the motion for preliminary injunction, reasoning that "creating such an unworkable situation could not have been Congress' intent." *Id.* at 305.  The district court's preliminary injunction was affirmed by the Second Circuit.  *HHS v. RxUSA Wholesale, Inc.*, 285 F. App'x 809, 812 (2d Cir. 2008).

14

Similarly, in *Doe v. Snyder*, *supra*, the district court struck down a state requirement to maintain an identification card because it was "legally impossible to comply" with the requirement if a person was homeless.  To obtain a card, the Michigan Secretary of State required two documents showing the person's address, which a homeless person could not provide.  *Snyder*, 101 F. Supp. 3d at 724-25.  As a result of the impossibility of performance, the requirement failed to pass Constitutional muster.  *Id.*

That is *exactly* the situation in which Plaintiffs' member farms find themselves following passage of the Act.  Section 3 of 2019 N.Y. Sess. Laws. ch. 105 addresses unionization of farm laborers.  Section 3 defines "farm laborer" as "any individual engaged or permitted by an employer to work on a farm, except the parent, spouse, child, or other member of the employer's immediate family." Thus, by the Act's express terms, coverage extends to farm owners and their extended family, as well as to salaried supervisors, executives, administrative, and professional employees.  The only exclusion to be found is the exclusion of the parent, spouse, child or other member of the *employer's* immediate family.  The NYSDOL has now interpreted that exclusion not to apply to "shareholders" and their immediate family members.  (Exhibit 11)

The Act also defines "farm labor" under its wage provisions (but not farm laborer).  It defines "farm labor" as "all services performed in agricultural employment in connection with cultivating soil, or in connection with raising or harvesting agricultural commodities, including raising, shearing, caring for and management of livestock . . . ."  ch. 105, § 4.  (Exhibit 3)  The breadth of that provision – and, in

15

particular, the "connection with" language – similarly would include supervisors and family members within the ambit of individuals providing "farm labor".

This presents the risk farms will violate the Act whether or not they classify supervisors and family members as farm laborers.  This ***damned if you do, damned if you don't*** dilemma arises as follows:   Under § 19 of the Act, it is unlawful "for an agricultural employer to . . . discourage an employee from participating in a union organizing drive, engaging in protected concerted activity, or otherwise exercising the rights guaranteed under this article."  (Exhibit 3; N.Y. Lab. Law Article 20, § 704-b; Exhibit 9)  Supervisors, owners and family members who are themselves farm laborers cannot be discouraged by the farm from exercising these rights.  But it is also unlawful for an employer to "(1) spy upon . . .  through agents or any other person, any activities of employees or their representative . . . or (2) dominate or interfere with the formation of [a union] . . .  by participating or assisting in supervising . . . the initiation or creation of [a union] . . . . or the meetings . . . elections of [a union] or by urging the employees to join [a union]."  (N.Y. Lab. Law Article 20, § 704; Exhibit 9)

The dilemma here is obvious.  Farms cannot interfere with supervisor rights to engage in union activities, yet supervisors are also agents of the farm, and therefore, they are prohibited from engaging in such activities.  If a farm tells its supervisors not to participate or assist in the creation of a union, or to refrain from attending union meetings and voting in union elections, it is violating the supervisor/farm laborer's rights under the Act.  But if a farm does not so instruct its supervisors, it is violating the collective bargaining rights of its other, non-supervisory farm laborers.

Similarly, employers are obligated by law to instruct their supervisory employees not to engage in certain activities that would be unduly influential (one way or the other) to those workers' rights to engage in concerted activity.  *See* 2019 N.Y. Sess. Laws ch. 105, § 19.  But if supervisors are covered by the Act (and they are not excluded under § 701(3)(c)), farms are prohibited from interfering with *their* rights to communicate with other workers regarding unions.  This creates an unworkable Catch 22, imposing on farms an obligation to engage in conduct that would violate other provisions of the Act and thereby creating conflicting prohibitions that cannot be reconciled.  *This reality has been recognized under federal law for decades -- and resolved by excluding supervisors from unions.*  (Section II.B. below)

The same concern exists regarding family members of owners and part owners of farms, where communications could constitute interference with concerted activities, yet the farms may be restricted from acting to deter those communications.  Indeed, farms routinely employ nieces and nephews or other family members.  (Exhibit 15) Those individuals and others may have rights to the farm through estate planning or simply family relationships that earn ownership through "sweat equity" or through earned opportunity to buy into the business.  (Exhibit 22) The Act's language in this respect therefore makes compliance impossible because it flouts the reality of family relations on farms. Farms must know which family members to restrict from involvement in activities that could unduly influence concerted activity -- and which family members it must allow to participate in such activities.  (Compare Exhibits 15, 16, 17)

17

**B.  The Act Is Preempted By Federal Law To The Extent It Includes Supervisors Within The Definition Of Farm Laborers.**

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land; . . . anything in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. Art. VI, cl. 2.  Accordingly, "[u]nder the doctrine of preemption, a corollary to the Supremacy Clause, any state or municipal law that is inconsistent with federal law is without effect."  *Greater N.Y. Metro. Food Council, Inc. v. Giuliani*, 195 F.3d 100, 104-05 (2d Cir. 1999) (abrogated on other grounds); *see also Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) ("state law that conflicts with federal law is 'without effect'").

There are two basic types of preemption, express and implied. *See Cipollone*, 505 U.S. at 516.  Express preemption is achieved by way of an explicit statement in a statute's language, or an "express congressional command."  *Id*.  Implied preemption occurs either when state law actually conflicts with federal law (i.e., conflict preemption), or "if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it" (known as field preemption).  *Id*. (citations and internal quotation marks omitted); *see also In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 312 (E.D.N.Y. 2005).

Field preemption occurs "if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it."  *Cipollone*, 505 U.S. at 516 (citations and quotation marks omitted).  The Supreme Court has recognized that field preemption applies where a state law "stands

as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (quotation omitted).

Congressional intent is "the ultimate touchstone of pre-emption analysis." *Cipollone*, 505 U.S. at 516; *see also FMC Corp. v. Holliday*, 498 U.S. 52, 56 (1990) ("In determining whether federal law pre-empts a state statute, we look to congressional intent."). Intent for the federal government to exclusively occupy a field "may be inferred from a 'scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *English*, 496 U.S. at 79 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

In this case, the Act is preempted by federal law to the extent it requires farms to classify supervisors as employees, with rights to wage, overtime and collective bargaining protections. The Act conflicts with the NLRA and attempts to legislate in a field dominated by the NLRA.

Passed in 1935, the NLRA (originally known as the Wagner Act), afforded workers the right to bargain collectively with their employers over wages, hours, and other terms and conditions of employment. While the NLRA applied to "employees" in general, it excluded agricultural workers (and other limited categories of workers) from the provision of these rights. The agricultural worker exemption remains to this day.

The NLRA also defines both "employers" and "supervisors". "The term 'employer' includes any person acting as an agent of an employer, directly or indirectly,

but shall not include [various exceptions inapplicable to farms]." 29 U.S.C. § 152(2).

"Supervisors" are defined as "any individual having authority, in the interest of the

employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward,

or discipline other employees, or responsibly to direct them, or to adjust their

grievances, or effectively to recommend such action, if in connection with the foregoing

the exercise of such authority is not of a merely routine or clerical nature, but requires

the use of independent judgment."[1] 29 U.S.C. § 152(11).

The NLRA clearly excludes supervisors from the definition of employees.

Specifically, Section 2 expressly excludes supervisors from the definition of "employee".

Section 14(a) goes a step further and exempts employers from the duty to consider

supervisors as employees under any law related to collective bargaining.  "Whether a

person enjoys supervisory status will determine, among other matters, that person's

right to vote in a union election, entitlement to Section 7 Rights [to engage in concerted

activities], and ability to bind the employer by statements and actions." (*See The

Developing Labor Law* § 27. III.C.2.a (7th ed. 2019); Exhibit 12).

For a time, federal labor laws permitted supervisors to form their own union, but

that law was abrogated in the 1947 Amendments to the NLRA.  Now the National

Labor Relations Board lacks authority to include supervisors in bargaining units with

other employees or to establish units composed of supervisory personnel.

---

[1] Although the NLRA's worker protections have no application to farm <u>laborers</u>, the definitions of "employer" and "supervisor" do not exclude farms or agricultural industries.  Thus, farms are "employers" and their supervisors are "supervisors" under the NLRA.  Accordingly, any law which obligates a farm to treat its supervisors as employees irreconcilably conflicts with the NLRA.

States are prohibited from extending collective bargaining rights to supervisors. *See Beasley v. Food Fair of N.C., Inc.*, 416 U.S. 653 (1974).  Section 14(a) of the NLRA provides that employers shall not be compelled to treat supervisors as employees in relation to any law relating to collective bargaining.

> (a) Supervisors as union members.  Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this Act [29 U.S.C. §§ 151–158, 159–169] shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

29 U.S.C. § 164(a).

Indeed, this case is controlled by the Supreme Court's decision in *Beasley*.   In *Beasley*, the Court considered whether the exclusion of supervisors from the NLRA's definition of "employee" preempted a state law "that provide[d] a private cause of] action for employees discharged for union membership."  416 U.S. at 654-55.  The Court held the NLRA "also freed the employer from liability in damages to the discharged supervisors", notwithstanding the state statute, because the federal law controlled.  *Id.*

The Supreme Court held that section 14(a) of the NLRA contained an express statement of preemption that precluded employers from treating supervisors as employees.  *Id.* at 657-62.  The Court concluded:

> [T]he second clause of § 14 (a) relieving the employer of obligations under "any law either national or local, relating to collective bargaining" applies to any law that requires an employer "to accord to the front line of management the anomalous status of employees."  S. Rep. No. 105, supra, at 5.  Enforcement against respondents in this case of §§ 95-81 and 95-83 would plainly put pressure on respondents "to

> accord to the front line of management the anomalous status of employees," and would therefore flout the national policy against compulsion upon employers from either federal or state agencies to treat supervisors as employees. *Cf. Teamsters Union v. Morton*, 377 U.S. 252, 258-260 (1964).

*Id.* at 622. Beasley has been followed and extended by Second Circuit authority. *See NLRB v. Meenan Oil Co., L.P.*, 139 F.3d 311, 320 (2d Cir. 1998) (quoting *Hanna Mining Co. v. Dist. 2, Marine Eng'rs Beneficial Ass'n*, 382 U.S. 181, 188 (1965)); *see also Schnurmacher Nursing Home v. NLRB*, 214 F.3d 260, 264 (2d Cir. 2000) (citing *Beasley*).  As the court recognized in *Meenan*, "[s]upervisors are not protected under the NLRA and do not possess a right to bargain collectively." 139 F.3d at 320.

Section 14(a) of the NLRA provides that employers shall not be compelled to treat supervisors as employees in relation to any law relating to collective bargaining. The Act conflicts directly with the NLRA – employees with supervisor capacities may unionize under the former but are prohibited from doing so under the latter.

## III.   PLAINTIFFS AND THEIR MEMBERS WILL SUFFER IRREPARABLE HARM IF THE ACT IS ENFORCED AS WRITTEN.

If the Act is permitted to take effect on January 1, 2020, farms will be in a position where they have to decide whether to classify their supervisors, owners and family members as farm laborers subject to wage, hour and overtime laws.  The consequences of a rushed, and ultimately erroneous, classification decision are severe.  If a farm decides to classify its supervisors, owners and family members as farm laborers, it will violate of the Act's collective bargaining provisions. [2]  On the other hand, if a farm takes

---

[2] It is common practice for employers to train managers and supervisors regarding communication with workers in order to assure compliance by owners, managers, supervisors and others in charge of the

the more logical position that supervisors, owners and family members are not farm

laborers, the farm will be subjecting itself to criminal and civil penalties. *New York State*

*Bar Ass'n v. Reno*, 999 F. Supp. 710, 715 (N.D.N.Y. 1998) (finding threat of potential

future penalties irreparable harm); *Le Van Hung v. Schaaf*, No. 19-cv-01436, 2019 U.S.

Dist. LEXIS 45331, at *2-3 (N.D. Cal. Mar. 19, 2019) (finding possibility of criminal

sanctions irreparable harm); *Doe v. Rensselaer Polytechnic Inst.*, No. 1:18-CV-1374, 2019

U.S. Dist. LEXIS 5396, at *13 (N.D.N.Y. Jan. 11, 2019) (threat of sanctions justifies

preliminary injunction). If the farm does nothing, it will be violating record-keeping

obligations, again subjecting the farm to criminal penalties. *Reno*, 999 F. Supp. at 715;

*Schaaf*, 2019 U.S. Dist. LEXIS 45331, at *2-3; *Rensselaer*, 2019 U.S. Dist. LEXIS 5396, at *13.

New York Labor Law Article 6, § 198-a provides penalties for failure to pay any

employee the wages applicable under New York Law. A first offense is a misdemeanor

carrying a punishment of not less than five hundred dollars ($500) nor more than

twenty thousand dollars ($20,000) or by imprisonment of not more than one year, and

in the event that any second or subsequent offense occurs within six years of the date of

conviction for a prior offense, shall be guilty of a felony.  (Exhibit 6).  This law now

applies to officers and agents of a company.  The Attorney General may prosecute

persons for non-payment of wages under N.Y. Labor Law, Article 7, § 214. (Exhibit 7)

---

business, so as to avoid violations of the law such as described in N.Y. Labor Law Article 20, § 704-b.  Such training needs to be completed prior to union related communications to be effective.  Employers are also obligated to enter into work agreements describing wage payments. (Exhibit 13)

The prospect of criminal sanction for compliance with a law is unquestionably irreparable harm. *See, e.g., Planned Parenthood SE, Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1288-89 (M.D. Ala. 2013) (choice between maintaining business operations and facing criminal penalties is irreparable harm).  As a result of these potential consequences, farm associations such as NYSVGA and NEDPA, cannot advise their member farms to wait to change their pay practices until after January 1, 2020, or until more clarification is provided by NYSDOL or PERB.

Moreover, once pay classifications and rates are codified in work agreements (the LS 309 form or something similar), the classification will have long-lasting, deleterious consequences for farms.  For example, the farms may be contractually obligated to maintain their classification of a supervisor as a farm laborer, even if the law is amended later. In fact, federal law *requires* farms who employ H2A workers to pay any amounts promised at the time of recruitment or start of employment.  Because the harm cannot be reversed or remedied after the Act goes into effect, it is by definition "irreparable."  *See Vidal v. Nielsen*, 279 F. Supp. 3d 401, 434 (E.D.N.Y 2013) (Irreparable harm "cannot be remedied by an award of monetary damages."). In addition, changing pay for some similarly situated employees, while not making such changes for others, due to artificial distinctions in the Act, will lead to irreparable harm due to damage to employee and family relations.  (*See* Exhibits 15-19).

## CONCLUSION

For the foregoing reasons, the Court should restrain application and enforcement of the Act until Plaintiffs' Motion for Preliminary Injunction can be heard and should

enjoin the Act's application and enforcement unless and until it is amended to address the constitutional deficiency.

Respectfully submitted,

By: _s/Charles B. Palmer_____
    Charles B. Palmer
    cbpalmer@michaelbest.com
    MICHAEL BEST & FRIEDRICH LLP
    N19 W24133 Riverwood Drive, Suite 200
    Waukesha, WI 53188
    Telephone: 262.956.6560
    Facsimile: 262.956.6565

    Leah H. Ziemba
    lhziemba@michaelbest.com
    Ian A. Pitz
    iapitz@michaelbest.com
    MICHAEL BEST & FRIEDRICH LLP
    One South Pinckney Street, Suite 700
    Madison, WI 53703
    Telephone: 608.257.3501
    Facsimile: 608.283.2275

    Dennis C. Vacco
    dvacco@lippes.com
    Scott S. Allen, Jr.
    sallen@lippes.com
    LIPPES MATHIAS WEXLER FRIEDMAN LLP
    50 Fountain Plaza, Suite 1700
    Buffalo, NY 14202-2216
    Telephone: 716.853.5100
    Facsimile: 716.853.5199

    Plaintiffs New York State Vegetable Growers Association, Inc. and Northeast Dairy Producers Association, Inc.